UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
10-21974-CIV-MARRA/JOHNSON
(04-20478-CR-MARRA)

---------------------------------------------------------X

UNITED STATES OF AMERICA,            :
        Respondent,
                                             :

       -against-
                                             :

TIMOTHY RAFFERTY,
        Petitioner.            :

---------------------------------------------------------X

**PETITIONER RAFFERTY'S REPLY TO GOVERNMENT'S ANSWER**

    I.    <u>THE GOVERNMENT IS RELYING ON THE WRONG DOCUMENTS</u>

In his motion to vacate his conviction, petitioner contended that the government suppressed exculpatory evidence — an internal memo refuting the trial testimony of a key government witness — in violation of *Brady* v. *Maryland*, 373 U.S. 83 (1963) and *Giglio* v. *United States*, 405 U.S. 150 (1972). The crux of the government's response is that the evidence was not suppressed, not relevant, not admissible, and could have been obtained by the defense at an earlier date. For good measure, it also alleges that a defense lawyer lied about the contents of the memo. However, all of these arguments are moot, since the government is referring to the wrong documents as the basis for its argument.

1

As petitioner clearly stated in his motion papers, he was referring to a single document: an internal memo authored by Lawrence Gallo, dated June 23, 2003, on UMDA letterhead.  *See* Affirmation in Support of Motion at ¶23; Memorandum in Support of Motion at p.9; Cox June 13, 2010, Affirmation at ¶4.  The government's answer inexplicably refers to two documents, neither of which bear any resemblance to the Gallo memo: (1) an undated, unsigned "side letter to a Stock Purchase Agreement" addressed to GTM shareholders and prepared on plain paper, without the distinctive UMDA logo; and (2) a draft of a loan agreement related to the GTM purchase.  *See* Government Answer at pp.10-11.  Had we been referring to those documents, the defense would agree with most, if not all, of the government's arguments related to their relevance.  Since, as is obvious from the plain words of the motion, this is not the evidence to which we are referring, the government's response is largely irrelevant to this Court's determination of the merits of petitioner's claim.

## II.    THE GOVERNMENT'S OTHER ARGUMENTS

Since the remainder of the government's arguments are presented in a scattershot manner without any overarching theme, petitioner will not attempt to deal with them thematically, but rather will address them seriatim:

### Respondent's claim #1

**"Rafferty has always been in possession of the GTM documents"**

**Petitioner's response**: Petitioner did *not* receive the Gallo memo in discovery. He came upon it fortuitously, as a result of his FOIA request and settlement with the SEC, years after the trial was over.[1]

### Respondent's claim #2

**"trial counsel for Rafferty, confident that the documents had been destroyed by the SEC," mischaracterized the missing document**

**Petitioner's response:** It is astounding that the government would accuse an attorney of lying under oath without a scintilla of evidence, particularly since the allegation does not bear even the most cursory scrutiny.

The government contends that Ms. Cox lied in her description of the document because she knew that it had been destroyed. However, when she e-mailed SEC attorney Anderson and asked for a copy of the memo, she could hardly have known that he would *subsequently* tell her it had been destroyed.

---

[1] Unfortunately, what makes this case unusual is not that the document was discovered so many years later, but that it was discovered at all. The withholding of evidence, by its very nature, is extremely difficult or impossible to detect, and *Brady* violations often remain undetected for may years after a conviction, if at all. The inherent difficulties in discovering a *Brady* violation also can result in calamitous consequences, including subjecting innocent or wrongly convicted citizens to protracted periods of incarceration. *See, e.g.,* Van de Kamp v. Goldstein, 129 S.Ct. 855, 859 (2009)(24 years of incarceration); Walker v. City of New York, 974 F.2d 293, 294 (2d Cir. 1992)(19 years of incarceration).

3

Her description to Anderson — *before* he told her the document had been shredded — was identical to the description she gave in her affirmation.[2]

### Respondent's Claim #3

**"The Loan Agreement . . . is completely in draft form," is "unreliable," and "[h]ad the government attempted to introduce this evidence, either as substantive or impeachment evidence, it would have been unable to lay an appropriate predicate"**

**Petitioner's response:** We agree with the government's contention that the loan agreement could not have been used to prove petitioner's loan to UMDA, since it was unsigned and in draft form. It is precisely for that reason that the Gallo memo was such an important piece of evidence for petitioner. While petitioner could have used the Gallo memo to great effect at trial, the draft agreement was just that — an unsigned draft of an unfinalized agreement — and it was of little or no use to petitioner at trial.

However, although the government now says it would have been "inappropriate" for it to use the draft agreement, it apparently did just that at trial:

> AUSA FERNANDEZ:   Okay.  I'm going to show you what's been previously marked as Government exhibit 748.

---

[2] It is also identical to the description she gave to me immediately after seeing it.

4

GALLO:	Thank you.

FERNANDEZ:	Have you ever seen that document before?

GALLO:	This looks like part of the closing documentation for Ground Troop Marketing.

FERNANDEZ:	Okay. And do you know why Mr. Rafferty would be owed $461,000 from Uncommon Media?

GALLO:	Well, that would mean he would have to put in $461,000 as an investment to do the convertible, which I was not aware that he put in $461,000.

FERNANDEZ:	At this time, we'd move that Government exhibit into evidence, Judge (T1386).

### Respondent's Claim #4

**"More troubling is counsel's mischaracterization of the contents of the Loan Agreement"**

**Petitioner's response:** It is unclear which "counsel" the government is referring to in this accusation. However, none of petitioner's lawyers ever characterized — to say nothing of mischaracterizing — the contents of the Loan Agreement. The draft loan agreement was never mentioned in my affirmation or in the memorandum of law in support of petitioner's motion, since I did not believe it was a significant document. Nor did Ms. Cox mention the draft agreement in her affirmation. The only mention of the agree-

5

ment is in Cox's e-mail message to Mr. Anderson, wherein she states: "Either attached to the memorandum, or chronologically close to it in the box is a draft loan agreement of the same date, which we do have." Cox e-mail, annexed as Exhibit A to Declaration of C. Ian Anderson.

### Respondent's Claim #5

**"As established at trial, this transaction never closed."**

**Petitioner's response:** Contrary to the government's allegation, their witnesses testified at trial that "this transaction" did, in fact, close. Gustavo Rodriguez, one of UMDA's founders, testified that "the Ground Troop deal was closed" (T80). Gallo's testimony was similar:

> Q: Did you say that UMDA finally closed the purchase of Ground Troop in June of 2003?
>
> A: That's correct (T1455).

### Respondent's Claim #6

**"that none of the defense lawyers thought it relevant to review the SEC documents until 2009 does not now make it a *Brady* violation"[3]**

---

[3] In making the argument that petitioner should have discovered the Gallo memo earlier, the government relied on the five-part test articulated in United States v. DiBernardo 880 F.2d 1216, 1224-25 (11th Cir. 1989). This is the wrong standard. The five-part test described in *DiBernardo* is the test to determine whether a defendant is entitled to a new trial under Rule 33 based on newly-discovered evidence, not for testing whether the government violated *Brady* in the context of a §2255 motion. *Id*. at 1224. Moreover, even in the context of a Rule 33 motion, the five-part test enunciated in *DiBernardo* should not be applied to a *Brady* violation claim. *See* United States v. Torres 569 F.3d 1277, 1281 (10th Cir. 2009) ("Where a *Brady* violation is claimed, the five-factor test is inapplicable").

**Petitioner's response:** When "information is fully available to a defendant at the time of his trial and his only reason for not obtaining and presenting the evidence to the court is his lack of reasonable diligence, the defendant has no *Brady* claim." United States v. Muldering, 120 F.3d 534, 540 (5th Cir. 1997). Here, by contrast, petitioner did not know about the Gallo memo and had no reason to know it existed:

> Absent any reason to believe that the prosecutor - who was under an obligation to turn over exculpatory evidence in his possession - had not been forthcoming, it was reasonable for the criminal defense attorney to rely on the completeness of the discovery materials produced by the prosecutor.

Christenson v. Ault, 598 F.3d 990, 997 (8th Cir. 2010) . *See also* Wilson v. Beard, 589 F.3d 651, 663 (3d Cir. 2009)(notwithstanding "due diligence" requirement, "the facts of the instant case do not even remotely suggest that defense counsel had any knowledge, or, more importantly, any responsibility to be aware of the" undisclosed evidence); United States v. Senn, 129 F.3d 886, 893 (7th Cir. 1997)(no *Brady* violation, "notwithstanding the defense team's alleged reliance on [government's] disclosure as complete, where defense counsel had reason to know that the government's disclosure was not exhaustive").

Nor was this a case where the undisclosed document was a matter of public record, *compare, e.g.,* Wright v. Hopper, 169 F.3d 695, 702 (11th Cir. 1999)(no *Brady* violation where the evidence at issue was a matter of public

record, about which the local newspapers had extensively reported), or where the information was already known to the defense, *see, e.g.* United States v. Olbel, 275 Fed. Appx. 910, 911 (11th Cir. 2008). *See also* Perry v. Quarterman, 314 Fed. Appx. 663, 670 (5th Cir. 2009)("Because . . . trial counsel had access to the necessary information, the prosecution had no duty to give further guidance as to what evidence may have been exculpatory"); United States v. Runyan, 290 F.3d 223, 246 (5th Cir. 2002)("Evidence is not suppressed if the defendant knows or should know of the essential facts that would enable him to take advantage of it")(*citations omitted*).

Rather, the defense team did not have any way of knowing that Gallo had written a memo which was in direct conflict with his testimony at trial and which corroborated petitioner's claim that he loaned $461,000 to UMDA. Nor did it have reason to believe that the prosecution team had relevant information that had not been disclosed to it during discovery.

### Respondent's Claim #7

**Petitioner is trying to "re-litigate the loss calculations performed by the district court and affirmed by the Eleventh Circuit"**

**Petitioner's response:** The government is, quite simply, mistaken, as any fair reading of petitioner's motion and supporting documents demonstrates. Petitioner's motion does not address this Court's loss calculation. Rather, his argument relates solely to the falsity of the government's theory at trial that petitioner stole a million dollars from UMDA.

8

As this Court is well aware, the Court's loss calculation was not based on petitioner's alleged diversion of UMDA funds. Rather, this Court calculated the loss by determining the total amount invested by the investors for the duration of the conspiracy, without regard to whether or not their investments were diverted. For loss calculation purposes, the truth of the allegation that petitioner had stolen a million dollars was of no moment.

Petitioner's motion is not complex, and it is difficult to explain how the government could misinterpret it to this extent. Petitioner is arguing that the government's representations to both the Court and the jury — that petitioner stole a million dollars from UMDA — were false. *See, e.g.,* United States v. Donato, 99 F.3d 426, 432 (D.C. Cir. 1997)(conviction reversed where, *inter alia,* the prosecutor overstated the amount of money involved in the case, presenting the jury with a stronger motive for the defendant to have committed the crime).

Perhaps most significant is what the government does *not* argue: the government is *not* disputing the conclusion derived from our forensic accounting, *i.e.,* that only $151,000 of the funds in the Rafferty-related accounts were investments in UMDA, far less than the $1 million the government claimed at trial, and far less than petitioner's $461,000 loan to the company as memorialized by the Gallo memo.[4]  Nor does the government assert that it was un-

---

[4] The government's argument was derived from its summary charts, which, it claimed, traced money that had been intended as investments in UMDA, into Rafferty-related accounts, and out for petitioner's personal expenses. This

9

aware of the fact that the monies traced in its summary charts were largely unrelated to UMDA.

### Respondent's Claim #8

**"Petitioner was not denied effective assistance of counsel when trial counsel failed to formally object to the introduction of the defendant's 1991 securities fraud conviction"**

**Petitioner's response:** Once again, the government simply ignores petitioner's actual position (that counsel was ineffective for failing to object to the introduction of *the information underlying* petitioner's prior conviction), substitutes a "straw man" (that his attorney should have objected to the introduction of the *conviction*) and refutes the "straw man" without ever addressing petitioner's real position.

Significantly, the government does not contend that there was any valid basis for introducing the underlying information. Nor does the government contend that the underlying information (and the summation remarks

---

case serves as a cautionary tale regarding the potential misuse of summary charts. *See, e.g.,* United States v. Lemire, 720 F.2d 1327, 48 (D.C. Cir. 1983)("there are obvious dangers posed by summarization of evidence. Although we usually defer to the district court's assessment of whether the probative value of evidence outweighs the possibility of prejudice, the pervasiveness of these dangers requires that we review the use of a summary witness closely")(*citations omitted*); United States v. Taylor, 210 F.3d 311 (5th Cir. 2000)( admission of summary chart was in error, where "admission of the chart allowed the government to assume that which it was required to prove beyond a reasonable doubt as operative facts of the alleged offense. A necessary precondition to the admission of summary charts is that they accurately reflect the underlying records or testimony, particularly when they are based, in part, on the government's factual assumptions").

related to it) did not prejudice petitioner. By insinuating that petitioner's criminal background made it more likely that he committed the present crime, the prosecutor encouraged the jury to find him guilty based on speculative, confusing, and inflammatory considerations.

### Respondent's Claim #9

**Petitioner is procedurally barred from raising ineffectiveness because he raised "the same issue involving the 1991 securities fraud conviction" in a Motion for a New Trial and on direct appeal.**

**Petitioner's response:** While the government accurately contends that petitioner previously raised the issue of the improper introduction of the information underlying his 1991 conviction, it is incorrect when it states that he is therefore precluded from raising the issue of his lawyer's ineffectiveness for failing to object to its introduction at trial.

As the government itself notes, the Court of Appeals did not address the merits of petitioner's argument because "counsel had specifically not objected to the physical introduction of the 1991 conviction . . . ." Government's Answer at p.20. It did not, however, address whether counsel was ineffective because of his failure to object.

Petitioner did not, and was not required to, raise ineffectiveness on direct appeal:

> In Massaro v. United States, 538 U.S. 500 (2003), the Supreme Court reaffirmed that "general rule

11

> [is] that claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice." However, the *Massaro* Court excepted ineffective-assistance-of-counsel claims from the general procedural default rule. *Id.* at 1696 (noting that a §2255 motion is preferable to direct appeal for deciding claims of ineffective assistance of counsel and that "failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under §2255").

Lyon v. United States, 365 F.3d 1225, 1234 n.17 (11th Cir. 2004).

In Thomas v. United States, 572 F.3d 1300 (11th Cir. 2009), the Eleventh Circuit rejected a similar procedural default argument.  There, the government argued, and the district court held, that the appellate court had considered and decided the defendant's ineffective assistance of counsel claim by "necessary implication" because the Court dismissed his appeal on direct review pursuant to *Anders*.  The Eleventh Circuit reversed, holding that it had not decided "either explicitly or implicitly, the ineffective assistance of counsel claims, precisely because those claims were neither presented nor considered by us." *Id.* at 1304.  The Court noted further:

> Generally, claims of ineffective assistance of counsel are not considered for the first time on appeal. . . .  We have even gone so far as to prohibit the consideration of ineffective assistance of counsel on direct appeal . . . .  [W]e pointed out that it borders if it does not enter the arena of the frivolous to assert the issue for the first time on direct appeal.

*Id.* at 1304-1305 (*citations omitted*).

## CONCLUSION

It is a testament to the strength of petitioner's claims that the prosecution feels the need to ignore his actual positions, attribute to him a point of view with a set-up implausibility that can be easily demolished, and then proceeds to argue against the set-up version as though it was petitioner's. It is yet one more example of the "win-at-any-cost" attitude that has prevailed throughout this case, an attitude that is not befitting a representative of the State. *See* Davis v. Zant, 36 F.3d 1538, 1548 n.15 (11th Cir. 1994) ("prosecutors have a special duty of integrity in their arguments"); Thompson v. Calderon, 120 F.3d 1045, 1058 (9th Cir. 1997)(*en banc*)(noting that a prosecutor "has the unique duty to ensure fundamentally fair trials by seeking not only to convict, but also to vindicate the truth and to administer justice), *rev'd on other grounds*, 523 U.S. 538 (1998); United States v. Duke, 50 F.3d 571, 578 n.4 (8th Cir. 1994)(prosecutor has "duty to serve and facilitate the truth-finding function of the courts").

In light of the government's failure to offer any legitimate basis for disputing petitioner's claims, his motion to vacate his conviction should be granted.

Dated: this 11th day of September, 2010.

*Marsha R Taubenhaus*
Marsha R. Taubenhaus
Attorney for Petitioner
110 Wall Street, 11th Floor
New York, New York 10005-3817
(212) 859-3513